In re GULL AIR, INC., Debtor.

**FEDERAL AVIATION ADMINISTRA-TION, Plaintiff, Appellant,**

v.

**GULL AIR, INC., Defendant, Appellee.**

No. 88–1780.

United States Court of Appeals, First Circuit.

Heard April 5, 1989.

Decided Dec. 7, 1989.

Bea L. Witzleben, Civil Div., Dept. of Justice, with whom John R. Bolton, Asst. Atty. Gen., Washington, D.C., Frank L. McNamara, Jr., U.S. Atty., Boston, Mass., M. Ellen Carpenter, Asst. U.S. Atty., David Bennett, Dept. of Transp., J. Christopher Kohn and Tracy J. Whitaker, Civil Div., Dept. of Justice, Washington, D.C., were on brief for plaintiff, appellant.

Peter J. Haley with whom Stephen F. Gordon and Gordon & Wise, Boston, Mass., were on brief, for defendant, appellee.

Before CAMPBELL, Chief Judge, BOWNES, Circuit Judge, and CAFFREY,* Senior District Judge.

CAFFREY, Senior District Judge.

This is an appeal from an order of the United States District Court for the District of Massachusetts which affirmed two orders entered by the United States Bankruptcy Court for the District of Massachusetts. In its first order, issued on July 15, 1987, the bankruptcy court authorized the debtor, Gull Air, to sell certain arrival and departure slots at LaGuardia Airport, ruling that the automatic stay provisions of the Bankruptcy Code prohibited the Federal Aviation Administration ("FAA") from withdrawing these slots from Gull Air. On July 29, 1987, the bankruptcy court issued its second order approving Gull Air's private sale of these slots. The FAA appealed both orders of the bankruptcy court to the district court. On April 27, 1988, the district court affirmed the bankruptcy court's decisions without an opinion. The FAA now appeals the district court's affirmance to this Court. We reverse.

* Of the District of Massachusetts, sitting by desig-

## I.

Congress enacted the Federal Aviation Act for the purpose of centralizing in a single authority the power to frame rules for the safe and efficient use of the nation's airspace. *French v. Pan Am Express, Inc.*, 869 F.2d 1, 5 (1st Cir.1989); *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 941 (5th Cir.1983); *Air Line Pilots Association, International v. Quesada*, 276 F.2d 892, 894 (2d Cir.1960). In the Act, Congress authorized the Secretary of Transportation to develop plans for and formulate policy with respect to the use of the navigable airspace. 49 U.S.C. App. § 1348(a), (c). Congress further directed the Secretary to assign the use of the navigable airspace under such terms, conditions and limitations as deemed necessary to insure the safety of aircraft and the efficient utilization of such airspace. 49 U.S.C.App. § 1348(a). Congress empowered the Secretary to prescribe rules and regulations to perform these functions. 49 U.S.C.App. § 1348(c).

The Secretary of Transportation delegated to the Federal Aviation Administrator the authority to carry out its powers and duties regarding the safety and utilization of the nation's navigable airspace. 49 U.S. C.App. § 1655(c)(1); 49 C.F.R. 1.47 (1988). Pursuant to its authority, the FAA promulgated a comprehensive scheme of federal regulations governing all aspects of air travel, including operations at high density airports. 14 C.F.R. § 1–199 (1989). The FAA's regulations prescribe rules governing the allocation, withdrawal and transfer of arrival and departure slots to individual air carriers and commuter operators at the high density airports. 14 C.F.R. § 93.211 (1989). A "slot" is the operational authority to conduct one landing or takeoff operation each day during a specific hour or thirty-minute period. 14 C.F.R. § 93.213(a)(2) (1989).

Pursuant to its regulations, in April of 1986 the FAA held a random lottery of

nation.

arrival and departure slots to determine their distribution. 14 C.F.R. § 93.225 (1989). By this lottery, the FAA allocated four slots at LaGuardia Airport to Gull Air, a regional commuter airline. Gull Air utilized these takeoff and landing slots until March 10, 1987 when Gull Air filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.[1] Upon filing, Gull Air ceased all active flight operations.

On July 7, 1987, the FAA notified Gull Air that its slots at LaGuardia had been withdrawn for nonuse. *See* 14 C.F.R. § 93.227(a), (d) (1989). The FAA specified that the effective date of withdrawal was July 17, 1987. The FAA planned to reallocate the slots to another carrier at a lottery to be held on July 22, 1987. On July 10, after receiving notification of withdrawal from the FAA, Gull Air filed with the bankruptcy court a motion for authority to sell landing slots and to enjoin the FAA from obtaining property of the estate, arguing that the automatic stay provision of the Bankruptcy Code protected the slots against FAA action. *See* 11 U.S.C. § 362(a).

At a motion hearing held on July 15, 1987, the bankruptcy court ruled that pursuant to the automatic stay provision of the Bankruptcy Code, which the court found applicable, Gull Air's bankruptcy petition operated as a stay on any action the FAA sought to take regarding Gull Air's slots at LaGuardia. During the hearing the bankruptcy court articulated two separate grounds for its ruling that the automatic stay applied. First, the bankruptcy court stated that the automatic stay applied because "this [was] a post petition attempt by the FAA to take action against a debtor ... to deprive it of whatever license it may have to use these slots." *See* 11 U.S.C. § 362(a)(1). The bankruptcy court then rejected the FAA's argument that its action qualified as a regulatory exception to the automatic stay. Although the FAA action was purely regulatory in nature, the bankruptcy court did not believe it was established to protect the health and safety of the general public. *See* 11 U.S.C. § 362(b)(4). Second, the bankruptcy court articulated another independent rationale for its ruling that the automatic stay provision applied: "Because it is a property right that you attempt to foreclose on. Basically, in essence, the action of the FAA is an attempt to foreclose upon this license." *See* 11 U.S.C. § 362(a)(3). Regarding the nature of the slots, the bankruptcy court stated,

> ... This may well be a property right. But I did not want to in effect say that, because I didn't want, necessarily, to have the FAA stuck with an off the bench opinion based upon what I had before me. But, if the FAA wants to know what the feeling of the Court is, and once again gentlemen counsel, please remember that it is only what you have given me orally here, I am inclined to the proposition that, pressed to the wall, this would be a property right. But I don't know that I have to find that it is a property right in its total sense. It's *a license in which the debtor has a proprietary interest since the regulation gives the debtor the privilege to sell it* (emphasis added).

Thus ruling that the automatic stay provision applied, the bankruptcy court granted Gull Air's motion for authority to sell, subject to FAA approval. The bankruptcy court, however, denied the motion to enjoin the FAA because its ruling on the automatic stay's applicability already protected Gull Air.

Subsequently, Gull Air filed a notice of private sale of the slots for $80,000; the FAA filed an objection to the sale. At a hearing held on July 29, 1987, the bankruptcy court approved the sale on the condition that Gull Air would not act before giving the FAA a reasonable period of time within which to file a motion for stay pending appeals. On August 20, 1987, the bankruptcy court granted the FAA's motion for stays pending appeals and consolidated the appeals of both of its orders. On appeal, the district court affirmed both

---

**1.** On February 29, 1988, the bankruptcy court confirmed a reorganization plan providing for the liquidation of Gull Air's assets and a pro rata distribution to creditors.

orders of the bankruptcy court without opinion. The FAA now appeals the district court's affirmance to this court.

## II.

The instant appeal requires this court to rule on whether the automatic stay provision of the Bankruptcy Code prevents the FAA from withdrawing and reallocating Gull Air's takeoff and landing slots at La-Guardia Airport. *See* 11 U.S.C. § 362. Section 362(a) of the Bankruptcy Code provides an automatic stay of certain actions against the debtor upon the filing of the bankruptcy petition. 11 U.S.C. § 362(a). Pursuant to section 362(a), the filing of the petition operates as a stay of:

> (1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title.

> . . . . .

> (3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

11 U.S.C. § 362(a)(1), (a)(3).[2] Section 362(b) specifies several exceptions to the automatic stay. 11 U.S.C. § 362(b). The exception relevant to this appeal is found in section 362(b)(4) which provides:

> (b) The filing of a petition ... does not operate as a stay—

> . . . . .

> (4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's policy or regulatory power.

This court notes, however, that this exception only applies to those actions which would be stayed under section 362(a)(1).

In this appeal, we first address whether the FAA's action regarding the slots is automatically stayed as an act against property of the estate under section 362(a)(3). 11 U.S.C. § 362(a)(3). Concluding that section 362(a)(3) does not stay the FAA's action, we then consider whether the FAA's action qualifies as a post-petition proceeding against the debtor automatically stayed under section 362(a)(1). 11 U.S.C. § 362(a)(1). We likewise decide that the FAA's action regarding the slots does not come within the stay of section 362(a)(1). Thus, concluding that FAA withdrawal and reallocation of Gull Air's slots are not stayed under either of these subsections of the Bankruptcy Code's automatic stay provision, we reverse.

## A.

We will first address whether the FAA's withdrawal and reallocation of the four slots at LaGuardia airport constitutes an action against "property of the estate" automatically stayed under section 362(a)(3) of the Bankruptcy Code. On appeal, the FAA asserts several alternative arguments as to the inapplicability of the automatic stay provision. The FAA argues that slots are not property of the carrier to which they are allocated, but rather operating privileges subject to absolute FAA control. Because these slots do not represent a property right, the argument continues, they do not constitute "property of the estate," and the FAA's actions regulating the slots are not within the purview of section 362(a)(3)'s automatic stay. Alternatively, the FAA argues that even if Gull Air possessed some limited proprietary interest in the slots, that interest terminated automatically by force of regulation, and therefore, the FAA's reallocation of the slots does not constitute an act to obtain property of the estate.

**2.** The bankruptcy court was ambiguous as to whether it held that FAA withdrawal and reallocation of the slots were stayed under section 362(a)(1) or section 362(a)(3). Consequently, this court considers the issue of whether the FAA's action is stayed under both subsections.

Section 541 of the Bankruptcy Code specifies the types of property which comprise the debtor's estate. 11 U.S.C. § 541. Pursuant to section 541, property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."[3] 11 U.S.C. § 541(a)(1). In determining whether Gull Air's landing slots constitute property of its estate, therefore, the fundamental question is whether Gull Air has any proprietary interest in these slots at all, or whether the slots simply represent a privilege to operate as the FAA asserts.

In 1983 the Court of Appeals for the Fifth Circuit addressed the precise issue of whether arrival and departure slots constitute property. *Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 942 (5th Cir.1983). In *In re Braniff*, the court ruled that the bankruptcy court did not have jurisdiction under section 105 of the Bankruptcy Code to issue orders protecting slots allocated to Braniff from withdrawal by the FAA because such slots were not property. *Id.* As the court stated,

> We cannot accept Braniff's characterization of the slots as its property.... The slots are actually restrictions on the use of property—airplanes; not property in themselves. As such, they are not within the jurisdiction of the [b]ankruptcy [c]ourt under § 105 of the Code.

*Id.* The court added that even if the slots gave rise to some limited proprietary interest, such a determination might at most allow a debtor to transfer them to another carrier, but the FAA would have to approve the transfer. *Id.*

Since the Fifth Circuit decided this issue in *In re Braniff*, three bankruptcy courts have considered whether slots constitute property of the estate. *See Air Illinois, Inc. v. FAA (In re Air Illinois)*, 53 B.R. 1, 2–3 (Bankr.S.D.Ill.1985); *American Central Airlines, Inc. v. O'Hare Regional Carrier Scheduling Committee (In the Matter of American Central Airlines)*, 52 B.R. 567, 570–71 (Bankr.N.D. Iowa 1985); *In re McClain Airlines, Inc.*, 80 B.R. 175, 178 (Bankr.D.Ariz.1987). The court in *In re Air Illinois* followed *In re Braniff*, holding that no proprietary interest is conveyed when an airline is authorized to use landing and take-off slots. *In re Air Illinois*, 53 B.R. at 2. Finding that the slots did not constitute property and thus, not property of the estate, the *In re Air Illinois* court ruled that the automatic stay of section 362(a) did not stay the FAA's revocation of the debtor's slots. *Id.* at 2–3.

The courts in *American Central Airlines* and *In re McClain Airlines*, however, disagreed with the *In re Braniff* court as to the nature of arrival and departure slots. *American Central Airlines*, 52 B.R. at 570–71; *In re McClain Airlines*, 80 B.R. at 178–79. In *American Central Airlines*, in which the court held that procedures employed by an airport scheduling committee to reallocate the debtor's slots constituted a "proceeding against the debtor" in violation of the automatic stay of section 362(a)(1), the court expressed the opinion, although unnecessary to decide the case, that the slots constituted property of the estate protected by the automatic stay of section 362(a)(3). 52 B.R. at 570–71. The court stated that "possession of an airport slot also entitles the holder to airport access ..." and that "[s]uch a possessory interest must constitute property of the estate." *Id.* at 571.

Similarly, in *In re McClain Airlines*, the court ruled that the debtor's slots constituted property of the estate. 80 B.R. at 179. The facts in *In re McClain Airlines* are most analogous to the facts of the dispute between Gull Air and the FAA; in that case, the FAA had similarly withdrawn the debtor's slots for nonuse pursuant to its regulations. *Id.* at 177. The debtor argued that it continued to possess rights in the slots because the FAA's withdrawal was improper. *Id.* at 179. The court held

---

**3.** Section 541 also excepts certain property interests from the debtor's estate. For example, subsection (b)(2) provides that "[p]roperty of the estate ... ceases to include any interest of the debtor as a lessee under a lease of nonresidential real property that has terminated at the expiration of the stated term of such lease during the case." 11 U.S.C. § 541(b)(2).

that the debtor did possess property rights in the slots, but that it had lost those rights if the FAA had properly and permanently withdrawn them.[4] *Id.* In holding that the slots were property, the court was influenced by the FAA's 1986 amendment to its regulations providing for the transfer of slots among carriers in exchange for money. *Id.* at 179; *see* 14 C.F.R. § 93.221(a) (1989).

We must agree with the court in *In re McClain Airlines* that administrative developments since the Fifth Circuit's decision in *In re Braniff* affect the nature, and influence our characterization, of arrival and departure slots. By amendment to its regulations, effective April 1, 1986, the FAA provided that "slots may be bought, sold or leased for any consideration and any time period...." 14 C.F.R. § 93.221(a) (1989). Pursuant to the regulations, such transfers must comply with certain conditions, including FAA approval. *See* 14 C.F.R. § 93.221 (1989). In adopting this amendment, the Department of Transportation stated:

> The Department has decided to adopt the "buy-sell" proposal to permit maximum reliance on market forces to determine slot distribution following the initial allocation of slots. The Department believes that the rule minimizes the need for government intervention in the continuing allocation and distribution of slots.... Finally, the Department believes that a market in slots will permit long-range stability in carrier planning and marketing that would not be available if slots were periodically reallocated using another mechanism such as lotteries or auctions.

High Density Traffic Airports; Slot Allocation and Transfer Methods; Final Rule, 50 Fed.Reg. 52,180, at 52,184 (1985).

■ In light of this "buy/sell" provision, which did not exist when the Fifth Circuit decided *In re Braniff,* we must conclude

that by granting carriers the right to buy and sell slots with the intent of maximizing reliance on market forces and minimizing government involvement regarding slot distribution, the FAA grants to carriers a limited proprietary interest in slots. *See Continental Air Lines, Inc. v. Hillblom (In re Continental Air Lines, Inc.),* 61 B.R. 758, 784 n. 51 (S.D.Tex.1986). We reach this conclusion despite the FAA's provision that "[s]lots do not represent a property right but represent an operating privilege subject to absolute FAA control...." *See* 14 C.F.R. § 93.223(a) (1989). This declaration by the FAA does not detract from the reality that a market for these slots exists in which carriers may buy and sell these slots. We cannot deny that a carrier possesses a proprietary right in allocated slots, even if limited as to the superior rights of the FAA. Accordingly, upon allocation by lottery in April of 1986, Gull Air received a proprietary interest in the four slots at LaGuardia airport.

Gull Air's interest in the slots, however, is a limited interest encumbered by conditions that the FAA imposed in its regulations. *See* 14 C.F.R. § 93.211–229 (1989). One condition placed on a carrier's rights in slots is the mandatory use requirement. *See* 14 C.F.R. § 93.227 (1989). The regulations provide that "any slot not utilized 65 percent of the time over a two-month period shall be recalled by the FAA." 14 C.F.R. § 93.227(a) (1989). When a carrier fails to comply with this "use or lose" provision, its interest in the unused slots terminates. The slots are withdrawn and the FAA may reallocate them to other carriers. *See* 14 C.F.R. § 93.227 (1989).

In this case, Gull Air failed to satisfy this condition; Gull Air ceased using the four slots at LaGuardia airport upon filing its bankruptcy petition on March 10, 1987. For the first 60 days after filing its petition, Gull Air was exempted from complying with the "use or lose" provision. *See*

---

**4.** In *In re McClain Airlines,* the debtor contested the FAA's withdrawal of the slots. 80 B.R. at 179. The court ruled that if the debtor had a right to contest the withdrawal under federal law, this right to contest constituted property of the estate. *Id.* Thus, the court held the FAA's

withdrawal of the slots temporarily stayed pending further proceeding in a forum of appropriate jurisdiction, an administrative forum, to conclusively establish the debtor's slot rights. *Id.* at 180.

14 C.F.R. § 93.227(d) (1989). Gull Air's "grace period" ended on May 9, 1987, after which Gull Air was required to comply with the "use or lose" provision to assure its continued possession of the slots. Gull Air, however, never resumed use of the four LaGuardia slots, thus failing to utilize the slots 65 percent of the time over a two-month period.[5] Having failed to satisfy this condition, its interest in the slots terminated at the latest on July 8, 1987.

Gull Air argued that termination of its proprietary interest in the slots for non-use did not occur automatically by operation of contract or law, but rather required an affirmative and discretionary act by the FAA to withdraw the slots. The FAA's affirmative act of withdrawal, Gull Air contended, constituted an act to obtain possession of property of the estate stayed by § 362(a)(3) of the Bankruptcy Code. We are unpersuaded that termination of Gull Air's rights to the slots required an affirmative act of withdrawal. Withdrawal of slots for non-use does not involve a discretionary decision by the FAA, but is mandatory; the regulation states that slots "...

*shall* be recalled by the FAA" for non-use. *See* 14 C.F.R. § 93.227(a) (1989). Since the FAA is given no discretion, but rather *must* recall the slots, we believe that Gull Air's proprietary interest in the slots ceased for all practical purposes when Gull Air failed to satisfy a necessary condition to its continued possession of the slots, namely use of the slots.[6] Gull Air's interest in the slots thus terminated by force of regulation with no need for affirmative action by the FAA. *See* 14 C.F.R. § 93.227(a) (1989). Accordingly, Gull Air's proprietary interest in the slots had expired as of July 8, 1987.[7]

Regardless of whether Gull Air's proprietary interest in the slots rises to the level of "property of the estate" within the meaning of the bankruptcy laws,[8] Gull Air lost its limited proprietary interest by its failure to satisfy a qualifying condition. The Bankruptcy Code does not create or enhance property rights of a debtor. *Moody v. Amoco Oil Company*, 734 F.2d 1200, 1213 (7th Cir.), *cert. denied*, 469 U.S. 982, 105 S.Ct. 386, 83 L.Ed.2d 321 (1984); *In re Advent Corp.*, 24 B.R. 612, 614

---

**5.** The FAA and Gull Air direct our attention to different two-month periods over which to analyze Gull Air's compliance with the "use or lose" condition. The FAA uses the two-month period from May 1, 1987 to June 30, 1987. Gull Air uses the two-month period immediately following Gull Air's grace period, from May 9, 1987 to July 8, 1987. No matter which period we look at, Gull Air obviously did not comply with the mandatory usage requirement; Gull Air did not use the slots during either period at all. The FAA promulgated these regulations and we would normally defer to its application of the regulation. *See* High Density Traffic Airports; Slot Allocation and Transfer Methods; Final Rule, 50 Fed.Reg. at 52,189 (1985). The 60–day grace period, however, complicates the FAA's application of the "use or lose" provision because the two-month period used by the FAA overlaps Gull Air's grace period. For the purposes of determining when Gull Air's interest in the slots terminated, therefore, we will recognize the later period identified by Gull Air. Accordingly, because of non-use, Gull Air's interest in the slots ceased at the earliest, on June 30, 1987, and at the latest on July 8, 1987.

**6.** Gull Air's interest could be characterized as a determinable fee interest in the slots, which interest reverts to the FAA upon failure to use the slots as mandated in the regulations. *Cf. Good Hope Refineries, Inc. v. Benavides*, 602

F.2d 998, 1001 (1st Cir.), *cert. denied*, 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979).

**7.** Under our interpretation, the FAA's July 7 letter to Gull Air was not an act withdrawing the slots, but was, in effect, merely notification to Gull Air that its interest in the slots had terminated by force of regulation. Upon receipt of notice a carrier must cease all use of those slots, 14 C.F.R. § 93.227(e), because it no longer has an interest in them. In this case the FAA specified in its letter that the withdrawal would be effective July 17 for administrative purposes and to allow Gull Air time to prepare for the loss of the slots.

**8.** In this case, we need not decide the issue of whether a carrier's proprietary interest in an arrival or departure slot constitutes "property of the estate" within the meaning of the Bankruptcy Code. *See* 11 U.S.C. § 362(a)(3); 11 U.S.C. § 541. Even if a carrier's interest in a slot rises to the level of "property of the estate," the interest would cease to be "property of the estate" when the interest expired by force of regulation. A carrier's interest in a slot is analogous to a debtor's interest in a lease which ceases to be "property of the estate" when the interest terminates at the expiration of the stated term of such lease during the bankruptcy case. *See* 11 U.S.C. § 541(b)(2); *supra* note 3.

(Bankr. 1st Cir.1982); *United States v. Professional Sales Corp. (In re Professional Sales Corp.)*, 56 B.R. 753, 764 (Bankr.N.D.Ill.1985); *Shell Oil Company v. Anne Cara Oil Co., Inc. (In re Anne Cara Oil Company)*, 32 B.R. 643, 647–48 (Bankr.D.Mass.1983); *D.H. Overmyer Telecasting Co., Inc. v. Lake Erie Communications, Inc. (In re D.H. Overmyer Telecasting Co., Inc.)*, 35 B.R. 400, 404 (Bankr. N.D. Ohio 1983). Thus, when a debtor's proprietary interest expires by operation of an express condition, the Bankruptcy Code does not preserve that interest and prevent termination. *See Good Hope Refineries, Inc. v. Benavides*, 602 F.2d 998, 1001–03 (1st Cir.), *cert. denied*, 444 U.S. 992, 100 S.Ct. 523, 62 L.Ed.2d 421 (1979); *In re P.I.N.E., Inc.*, 52 B.R. 463, 470 (Bankr.W. D.Mich.1985); *In re Crabb*, 48 B.R. 165, 167 (Bankr.D.Mass.1985). Accordingly, Gull Air's filing of a bankruptcy petition did not preserve Gull Air's interest in the LaGuardia slots and prevent that interest from automatically expiring upon Gull Air's failure to use the slots as required.

Gull Air's interest in the slots having automatically ceased prior to Gull Air's request for authority to sell the slots, Gull Air no longer possessed any interest in the slots which it could sell. Thus, the bankruptcy court erred in granting Gull Air authority to sell the slots and approving a private sale. Moreover, because Gull Air lost its proprietary interest in the slots without any affirmative act of withdrawal by the FAA, the FAA's withdrawal and reallocation of the slots do not constitute acts to obtain possession of property of the estate under section 362(a)(3) of the Bankruptcy Code. We conclude, therefore, that the automatic stay of section 362(a)(3) does not prevent the FAA from reallocating the four LaGuardia slots.

**B.**

■ We will next consider whether the FAA's withdrawal and reallocation of the LaGuardia slots are automatically stayed under section 362(a)(1) of the Bankruptcy Code. Again, section 362(a)(1) stays "the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor...." 11 U.S.C. § 362(a)(1). On appeal, the FAA argues that its withdrawal and reallocation of the slots is excepted from the stay of section 362(a)(1) pursuant to section 362(b)(4) which provides that "[t]he filing of a petition ... does not operate as a stay ... of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power." *See* 11 U.S.C. § 362(b)(4). Because we conclude that the FAA's withdrawal and reallocation of slots do not qualify as administrative actions or proceedings against the debtor within the purview of section 362(a)(1), we do not reach the FAA's arguments as to the applicability of the section 362(b)(4) exception.

As the legislative history of the automatic stay provision reveals, the scope of section 362(a)(1) is broad, staying all proceedings, including arbitration, license revocation, administrative and judicial proceedings. H.R.Rep. No. 595, 95th Cong., 1st Sess. 340 (1977), *reprinted in* 1978 U.S. Code Cong. & Admin.News 5787, 6297; S.Rep. No. 989, 95th Cong., 2d Sess. 50 (1978), *reprinted in* 1978 U.S.Code Cong. & Admin.News at 5836. The actions and proceedings which courts have held stayed under section 362(a)(1) have involved affirmative actions by governmental bodies or other acting entities taken after discretionary decisions, deliberation, investigation and/or a hearing. *See Corporacion De Servicios Medicos Hospitalarios De Fajardo v. Mora, et al. (In re Corporacion De Servicios Medicos Hospitalarios De Fajardo)*, 805 F.2d 440 (1st Cir.1986) (department of health's termination of debtor's contract and revocation of debtor's license to operate hospital); *In re Advent Corporation*, 24 B.R. 612 (Bankr. 1st Cir. 1982) (action taken by surety and customs to cancel bond); *Advanced Professional Home Health Care, Inc. v. Blue Cross and Blue Shield of Michigan (In re Advanced Professional Home Health Care, Inc.)*, 82 B.R. 837 (Bankr.E.D.Mich.1988) (Department of Health and Human Services withholding medicare funds from debtor health

care provider); *Pester Refining Company v. Insurance Company of North America (In the Matter of Pester Refining Company)*, 58 B.R. 189 (Bankr.S.D.Iowa 1985) (insurance company's cancellation of debtor's insurance policy); *American Central Airlines, Inc. v. O'Hare Regional Carrier Scheduling Committee (In the Matter of American Central Airlines)*, 52 B.R. 567 (Bankr.N.D.Iowa 1985) (airport scheduling committee's procedure to deprive debtor airline of landing slots); *Wegner Farms Company v. Merchants Bonding Company (In re Wegner Farms Company)*, 49 B.R. 440 (Bankr.N.D.Iowa 1985) (bonding company's cancellation of debtor's grain dealer's surety bond); *In re Rath Packing Co.*, 35 B.R. 615 (Bankr.N.D.Iowa 1983) (state insurance commissioner's revocation of debtor's self-insurance exemption).

As previously discussed, withdrawal of Gull Air's slots did not involve an affirmative act on the part of the FAA. Gull Air's rights in the slots ceased automatically without any FAA action because Gull Air failed to use them. *See* 14 C.F.R. § 93.227(a) (1989). The FAA's July 7 letter was merely notification to Gull Air that it had lost its rights in the slots.[9] Nor did withdrawal involve a discretionary decision or deliberation by the FAA; withdrawal was automatic and mandatory upon Gull Air's failure to use the slots as required. *See* 14 C.F.R. § 93.227(a) (1989). Consequently, we conclude that withdrawal of Gull Air's slots does not constitute an administrative action or proceeding against the debtor falling within the purview of section 362(a)(1) of the Bankruptcy Code. Additionally, once Gull Air's rights in the slots had expired, any action the FAA might take to reallocate the slots would not

qualify as an action or proceeding against the debtor.[10]

Furthermore, proceedings or claims arising post-petition are not subject to the automatic stay of section 362(a)(1). *See Avellino & Bienes v. M. Frenville Co., Inc. (In the Matter of M. Frenville Co., Inc.)*, 744 F.2d 332, 335 (3d Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985); *In re Anderson*, 23 B.R. 174, 175 (Bankr.N.D.Ill.1982). Thus, even if withdrawal or reallocation were to qualify as "an action or proceeding against the debtor," it would not be stayed because it arose post-petition. Neither withdrawal, nor reallocation of Gull Air's slots "was or could have been commenced before commencement" of the bankruptcy case as required to stay the action under section 362(a)(1). *See* 11 U.S.C. § 362(a)(1) (1989). Gull Air did not fail to comply with the "use or lose" provision of the regulations until after it filed for bankruptcy. *See* 14 C.F.R. § 93.227. Under its own regulations, therefore, the FAA could not have withdrawn or reallocated Gull Air's slots because of non-use prior to Gull Air's filing for bankruptcy and subsequent failure to comply with the "use or lose" provision. *See id.* Thus, withdrawal and reallocation of the LaGuardia slots are not stayed under section 362(a)(1) of the Code because neither qualifies as an action or proceeding against the debtor which was or could have been commenced before the commencement of the bankruptcy case.

### III.

In sum, the automatic stay provision of the Bankruptcy Code does not stay withdrawal of Gull Air's slots or the FAA's reallocation of these slots. Although Gull

---

**9.** *See* supra note 7.

**10.** The FAA's regulations do provide that in certain circumstances the FAA may actively withdraw slots from carriers to provide such slots for international operations, essential air services, or other operational needs. *See* 14 C.F.R. §§ 93.223, 93.227(h) (1989). Under these provisions, withdrawal of slots does involve a discretionary decision and an affirmative act of withdrawal by the FAA. Thus, withdrawal pursuant to these regulations might constitute an action

or proceeding against the debtor stayed under section 362(a) of the Bankruptcy Code if the FAA did or could have taken the action prior to the carrier's filing for bankruptcy. 11 U.S.C. § 362(a). If the automatic stay did apply in such a case, the issue would then be whether the FAA's action fell within the exception of section 362(b)(4) for governmental enforcement of police or regulatory powers. *See* 11 U.S.C. § 362(b)(4). We leave that issue for later determination in an appropriate case.

Air did possess a limited proprietary interest in the arrival and departure slots at LaGuardia, that interest expired automatically upon Gull Air's failure to use the slots as required by the FAA regulations. Cessation of Gull Air's interest required no affirmative act or decision of withdrawal by the FAA, and thus withdrawal of the slots did not constitute an act to obtain possession or control over property of the estate stayed under section 362(a)(3). Likewise, once Gull Air lost its proprietary interest in these slots, the FAA's reallocation of these slots could not qualify as an act against property of the estate. The FAA, therefore, is free to reallocate these slots. Gull Air, in contrast, cannot sell these slots because it no longer possesses any interest to sell. Furthermore, the automatic stay of section 362(a)(1) does not apply because withdrawal and reallocation of these four slots are not actions or proceedings against the debtor which could have been commenced before Gull Air filed for bankruptcy. Accordingly, the district court erred in affirming the bankruptcy court's orders authorizing Gull Air to sell the LaGuardia slots and approving a private sale of these slots.

We reverse.